# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1727V
UNPUBLISHED

| | |
|---|---|
| TODD L. FRIBERG, | Chief Special Master Corcoran |
| Petitioner, | Filed: July 6, 2022 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |
| Respondent. | |

*Nancy Routh Meyers, Turning Point Litigation, Greensboro, NC, for Petitioner.*

*Jennifer Leigh Reynaud, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On November 6, 2019, Todd L. Friberg filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged the Table claim that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving the influenza vaccine on October 18, 2018. Petition at 1, ¶¶ 2, 20. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although a ruling on entitlement in Petitioner's favor was issued in June 2021, the parties have been unable to resolve damages on their own.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$125,102.92**, **representing $117,000.00 for actual pain and suffering and $8,102.92 for past lost wages.**

## I.      Relevant Procedural History

The day after he filed his petition, Mr. Friberg filed the medical records and affidavit required under the Vaccine Act. Exhibits 1-5, filed Nov. 7, 2019, ECF No. 5; *see* Section 11(c). On November 13, 2019, the case was activated and assigned to the SPU (OSM's adjudicatory system for attempting to resolve cases deemed likely to settle). ECF No. 8.

At Respondent's request, Petitioner filed additional documentation clarifying information provided in the vaccine record. Exhibit 6, filed June 19, 2020, ECF No. 15. By March 2021, Petitioner had conveyed a demand and additional supporting documentation to Respondent. ECF No. 29.

On June 23, 2021, Respondent filed his Rule 4(c) Report conceding Petitioner was entitled to compensation, and I issued a Ruling on Entitlement two days later. ECF Nos. 34-35. For approximately eight months thereafter, the parties attempted to informally resolve the issue of damages. *See, e.g.*, Status Report, filed Nov. 1, 2021, ECF No. 41. On February 22, 2022, they informed me they had reached an impasse in their damages discussions. ECF No. 45.

During the subsequent two-month period, the parties filed their damages briefs, and Petitioner filed supplemental affidavits from his wife and himself. Exhibits 8-9, ECF No. 47; Petitioner's Damages Brief ("Brief"), ECF No. 48; Respondent's Brief on Damages ("Opp."), ECF No. 50. On May 2, 2022, Petitioner filed a reply brief. Petitioner's Reply in Further Support of Damages ("Reply"), ECF No. 51. The matter is now ripe for adjudication.

## II.      Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

*Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.     Prior SIRVA Compensation Within SPU[4]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2022, 2,723 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,651 of these cases, with the remaining 72 cases dismissed.

Of the compensated cases, 1,513 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 114 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,371 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 1,138 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.,* No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[6] Agreement |
|---|---|---|---|---|
| Total Cases | *114* | *1,371* | *28* | *1,138* |
| Lowest | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| 1st Quartile | $72,354.81 | $67,472.00 | $90,000.00 | $40,000.00 |
| Median | **$102,479.12** | **$86,927.85** | **$122,886.42** | **$60,000.00** |
| 3rd Quartile | $125,343.45 | $115,000.00 | $161,001.79 | $115,000.00 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.    Pain and Suffering Awards in Reasoned Decisions

In the 114 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $100,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[7]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). Only one required surgery. Except in

---

[6] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[7] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

one case with an award for pain and suffering slightly below the median amount, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions, a PT duration of more than three years, and multiple cortisone injections, were required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## IV.    The Parties' Arguments

The parties agree Petitioner should be awarded $8,102.92 for past unreimbursed lost wages. Brief at 5 n.1; Opp. at 1-2, 2 n.1, 8. Thus, the only area of disagreement is the amount of compensation which should be awarded for Petitioner's pain and suffering. Petitioner seeks $150,000.00 for his pain and suffering, and Respondent argues for an award of $70,000.00. Brief at 15; Opp. at 1, 8; Reply at 1, 8.

The parties' primary disagreement involves the duration of Petitioner's SIRVA injury. Although he acknowledges significant improvement following his arthroscopic surgery and post-surgical PT, Petitioner maintains that his shoulder condition worsened over time. Brief at 7-9; Reply at 4-5. He insists that he continues to experience pain and limitations related to his SIRVA injury, more than three years post-vaccination. In contrast, Respondent argues that Petitioner's SIRVA injury lasted less than a year. Opp. at 7. Emphasizing the improvement reported at Petitioner's last post-surgical PT session - approximately eleven months post-vaccination - he contends that Petitioner has failed to provide the preponderance evidence needed to connect his later shoulder pain to his 2018 SIRVA injury. *Id.* at 6 n.5.

Although the parties agree that Petitioner initially sought treatment for his left shoulder pain approximately 32 days post-vaccination, they characterize this timing differently. Respondent argues it shows "symptomology that was not significant enough to prompt treatment until thirty-two days after vaccination." Opp. at 6. Petitioner maintains that it "is an appropriate amount of time and does not suggest that [his] injury was mild."

Reply at 7-8.

Similarly, the parties deviate in their views regarding the persuasive weight allotted specific information contained in the medical records. Petitioner insists that he did not provide the statements showing significant improvement at his last PT session in early September 2019, and thus, disputes their accuracy. Brief at 3; Reply at 4 n.2; Exhibit 8 at ¶¶ 4-5 (Petitioner's affidavit); Exhibit 9 at ¶ 4 (Petitioner's wife's affidavit). Respondent stresses that the statements linking Petitioner's later pain to his SIRVA injury which appear in the report of a second MRI - performed in September 2021, appear to have been provided by Petitioner at a time when the parties were discussing the damages to be awarded in the case. Opp. at 5 nn.2-3. Thus, he maintains they should not be afforded the persuasive weight usually given to contemporaneously created medical records.

When arguing for the greater pain and suffering award he seeks, Petitioner compares the facts and circumstances in his case favorably with the experiences of the petitioners in *Reed* and *Tumolo,* who received $160,000.00 and $170,000.00, respectively, for their past pain and suffering.[8] Brief at 11-15. Claiming that a comparison of the amounts awarded in *Reed* and *Tumolo* illustrates that a $10,000.00 difference was deemed appropriate to reflect the younger age and longer duration found in *Tumolo,* Petitioner urges me to apply a similar deduction to the $160,000.00 awarded in *Reed* to reflect Petitioner's greater age – resulting in an award of $150,000.00. *Id.* at 13-14.

Petitioner also cites *Wilson,* a case involving a pain and suffering award of $130,000.00,[9] as an example of a less severe SIRVA injury. Brief at 14-15. Stressing that the *Wilson* petitioner suffered co-morbidities both prior to and after vaccination, he insists his pain levels, duration of symptoms, and injury impact were greater. *Id.*

Respondent does not provide comparable cases with similar pain and suffering awards to the amount he is proposing. Opp. at 5-8. Instead, he includes discussions on the following topics: 1) his preference for the holding in *Hocraffer* over *Graves,* 2) his belief that comparisons to reasoned SIRVA decisions are problematic due to the smaller quantity of this type of award, and 3) a "meeting-in-the-middle" method that Respondent believes is being utilized by the special masters when determining the appropriate amount of damages to be awarded. *Id.* at 6 n.4, 7-8; *see Graves,* 109 Fed. Cl. 579; *Hocraffer v. Sec'y of Health & Hum. Servs.,* No. 99-0533V, 2007 WL 914914 (Fed. Cl. Spec. Mstr. Feb. 28, 2007).

---

[8] *Reed v. Sec'y of Health & Hum. Servs.,* No.16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019; *Tumolo v. Sec'y of Health & Hum. Servs.,* No.16-0343V, 2020 WL 6279711 (Fed. Cl. Spec. Mstr. Oct. 1, 2020).

[9] *Wilson v. Sec'y of Health & Hum. Servs.,* No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021).

In his reply brief, Petitioner addresses the more general arguments raised by Respondent, noting they had been previously discussed but rejected. Reply at 1-4. He also argues Respondent has ignored or misrepresented key evidence and facts and improperly devalued his SIRVA injury. *Id.* at 4-8.

## V.    Appropriate Compensation for Petitioner's Pain and Suffering

### A.    General Guidance for Analysis

The guidance provided by the *Graves* decision is clear,[10] and I have previously addressed the more general arguments made by Respondent during expedited motions days and in other damages decisions. While noting that "meeting in the middle" may occur in some cases (and disappoint both sides as a result), I have in fact rejected it as a tool for deciding damages disputes, because "each petitioner deserves an examination of the specific facts and circumstances in her or his case." *Sakovits*, 2020 WL 3729420, at *3. I also have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters. *Id.* at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Taken as a whole, however, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases.

### B.    Specific Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Mr. Friberg suffered a moderate to severe SIRVA injury for approximately six months – until undergoing

---

[10] *See supra* Section II (for further discussion).

arthroscopic surgery in late April 2019. Thereafter, he showed significant improvement during four months of PT. By early September 2019 – approximately eleven months post-vaccination - Petitioner's SIRVA injury had resolved.

Although Petitioner maintains that his injury gradually worsened thereafter, requiring further treatment beginning in August 2021, the record does not support this interpretation of his course. He has failed to provide sufficient evidence to link his later shoulder pain to the SIRVA injury he suffered in the fall of 2018.

Prior to his April 2019 surgery, Petitioner routinely showed moderate limitations in range of motion ("ROM") and reported pain levels that ranged from zero to three at rest and eight to ten with activity.[11] Exhibit 4 at 27-28, 23-24, 19-20, 16-17 (in chronological order). An MRI - performed in late December 2018, revealed a full-thickness rotator cuff tear, moderate degenerative changes, and mild bursitis. *Id.* at 34.

During this six-month period, Petitioner pursued conservative treatment for his SIRVA injury. Exhibit 4 at 20-31. On January 15th, he was administered a cortisone injection (*id.* at 25) which provided some temporary relief (*id.* at 20). However, he continued to report pain, soreness, and stiffness while attending 11 PT sessions from January 18th through February 26th. Exhibit 5 at 125-52. By his seventh PT session on February 12th, Petitioner reported worsening pain – at a level of five to six at rest and seven to eight when lifting his arm. *Id.* at 133. At his next orthopedic appointment – on February 28th, Petitioner reported that the temporary relief afforded by the cortisone injection was wearing off, and that his pain levels were three at rest and nine with activity. Exhibit 4 at 20. He continued to exhibit limitations in his ROM. *Id.*

On April 26, 2019, Petitioner underwent arthroscopic surgery to repair a full thickness rotator cuff tear. Exhibit 4 at 32-33. The surgery included a subacromial decompression, biceps tenodesis,[12] bioinductive augmentation implantation,[13] and extensive debridement of the glenohumeral joint and subacromial space. Exhibit 4 at 32.

At his first orthopedic visit post-surgery, Petitioner reported improved pain levels –

---

[11] The provided pain levels are based upon a scale of zero to ten.

[12] Biceps tenodesis surgery treats injuries that happen when you tear or damage the tendon that connects your biceps muscle to your shoulder. *See* https://my.clevelandclinic.org/health/treatments/21926-biceps-tenodesis (last visited July 6, 2022).

[13] Bioinductive augmentation implantation is a relatively new procedure used during arthroscopic surgery to repair rotator cuff tears in an attempt to promote healing. *See* https://www.arthroscopysportsmedicineandrehabilitation.org/article/S2666-061X(21)00119-X/fulltext (last visited July 6, 2022).

three at rest and four with activity. Exhibit 4 at 14. It was noted that he was in a sling and had not yet started PT. *Id.*

Petitioner began his post-surgical PT on May 7, 2019. Exhibit 5 at 117-20. By May 21st, he reported decreased pain levels overall, currently no pain, and 60 percent improvement since starting PT. *Id.* at 105. He was able to stop using a sling by June 6. *Id.* at 94.

Although he experienced some temporary increase in symptoms with activity,[14] Petitioner continued to show good overall improvement. By July 1st, Petitioner indicated he was 75 percent improved and experiencing pain at a level of one to two. Exhibit 5 at 75. Two days later, he had no pain or soreness despite mowing the yard and performing activities that he "hadn't done in a long time." *Id.* at 70. By August, he reported 85 percent improvement. *Id.* at 46. And at the end of August, Petitioner reported no pain and 98-99 percent improvement. *Id.* at 18, 15 (chronologically). When discharged from PT on September 5, 2019, Petitioner reported "feeling great" and being "100% improved since starting therapy." *Id.* at 2. It was noted that he had met all PT goals. *Id.* at 3-4.

Although Petitioner disputes the depiction of a full recovery found in the PT record created on September 5, 2019,[15] the remainder of the PT records align with this evidence. Petitioner showed steady improvement during 42 post-surgical PT sessions Petitioner attended from early May through September. Additionally, information contained in contemporaneously created medical records are generally viewed as more reliable that any current assertions, especially when they are supported by other medical record entries. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Similarly, Petitioner's claims of left shoulder pain gradually returning and forcing him to seek treatment again on August 31, 2021, are not supported by the contemporaneously created medical records. Throughout this almost two-year gap in treatment, Petitioner visited his orthopedist on multiple occasions for right knee pain, undergoing surgery on November 25, 2020. Exhibit 7 at 15-52, 60-98. However, he failed to mention left shoulder pain at any of these orthopedic appointments.

The only evidence supporting Petitioner's assertion of left shoulder pain from September 2019 through August 2021 are histories provided by Petitioner in August 2021, and the assertions made by Petitioner and his wife in their affidavits executed in April 2022. Exhibit 7 at 11, 53; Exhibit 8 at ¶ 3; Exhibit 9 at ¶ 3. It is not sufficient to support

---

[14] For example, on May 30th, Petitioner reported a pain level of four following an appointment with his orthopedic surgeon that morning. Exhibit 5 at 100. On June 13th, he reported "some soreness after his exercises at home." *Id.* at 86.

[15] Brief at 3; Reply at 4 n.2; Exhibit 8 at ¶¶ 4-5; Exhibit 9 at ¶ 4.

Petitioner's claim of a SIRVA injury which continued beyond September 2019 – eleven months post-vaccination.

Given my finding regarding the duration of Petitioner's injury, the cases provided by Petitioner are not suitable comparisons for this case. The only helpful comparison is the *Wilson* case – but its award exceeds what the facts of this case support. The *Wilson* petitioner experienced significant pain levels and an overall injury for approximately twice the lengths of time as Petitioner – eleven and more than thirty months vs. six and eleven months for Petitioner. *Wilson,* 2021 WL 1530731, at *3-4. Thus, the amount awarded Petitioner in this case should fall well below the $130,000.00 given to the *Wilson* petitioner.

Instead, I find that the cases of *Issertell* and *Rector* – in which the petitioners were awarded $112,500.00 and $120,000.00, respectively[16] - offer better comparisons to the facts and circumstances in this case. Both involve petitioners who experienced seven and five months of severe pain, respectively, followed by similar arthroscopic surgeries, and good resolution of their symptoms within one year. *Issertell*, 2022 WL 2288247, at *2-6; *Rector,* 2020 WL 4692449, at *2-3. However, the *Issertell* petitioner underwent less PT, and it was unclear how much of her chiropractic care was for her shoulder injury. *Issertell*, 2022 WL 2288247, at *2-6, 9. And, although it only provided some temporary relief, Petitioner received a cortisone injection, which the *Rector* petitioner did not. *Rector,* 2020 WL 4692449, at *2-4. Thus, I find that the award in this case should be more than what the *Issertell* petitioner received, while close to what the *Rector* petitioner was awarded.

## VI.    Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $117,00.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[17] I also find that Petitioner is entitled to $8,102.92 in actual unreimbursable lost wages.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $125,102.92 in the form of a check payable to Petitioner.** This

---

[16] *Issertell v. Sec'y of Health & Hum. Servs.,* No. 20-0099V, 2022 WL 2288247 (Fed. Cl. Spec. Mstr. May 17, 2022); *Rector v. Sec'y of Health & Hum. Servs.,* No. 17-1767V, 2020 WL 4692449 (Fed. Cl. Spec. Mstr. July 13, 2020).

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.,* No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.